IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GRIER E. GUSTAFSON,                )
                                   )
        Plaintiff,                 )
                                   )
   v.                              )       1:10CV833
                                   )
CAROLYN W. COLVIN,                 )
Acting Commissioner of Social      )
Security,[1]                       )
                                   )
        Defendant.                 )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

Plaintiff Grier E. Gustafson brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)) (the "Act"), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the court for review. For the reasons set forth below, the Commissioner's motion will be granted, Gustafson's motion will be denied, and this case will be dismissed.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Colvin should be substituted for Michael J. Astrue as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## I. PROCEDURAL HISTORY

Gustafson applied for DIB and SSI on July 21, 2005,[2] alleging a disability onset date of June 30, 2001. (Tr. at 47-51.)[3] The applications were denied initially (Tr. at 33, 41-45) and on reconsideration (Tr. at 31, 36-38), and Gustafson requested a hearing *de novo* before an Administrative Law Judge ("ALJ") (Tr. at 34). Present at the hearing, held on January 21, 2009, were Gustafson, her attorney, and a vocational expert ("VE"). (Tr. at 669-91.) On May 5, 2009, the ALJ determined that Gustafson was not disabled within the meaning of the Act. (Tr. at 12-24.) On September 21, 2010, the Appeals Council denied Gustafson's request for review, thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review. (Tr. at 7-10.)

In making this disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Gustafson] meets the insured status requirements of the . . . Act through December 31, 2002.
>
> 2. [Gustafson] has not engaged in substantial gainful activity since June 30, 2001, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

---

[2] Gustafson filed her first application for DIB and SSI on July 29, 2002. (Tr. at 52-54.) After that application was denied initially on October 2, 2002, she did not pursue it further. (Tr. at 15, 33, 41-45.)

[3] Transcript citations refer to the Administrative Transcript of Record filed manually with the Commissioner's Answer (Doc. 12).

> 3. [Gustafson] has the following severe impairments: Bipolar Disorder; Anxiety; Depression; Post-Traumatic Stress Disorder; History of Polysubstance Abuse in Remission; Disorder of the Lumbar Spine, Status Post Surgery; and History of Seizures (due to drug abuse) (20 CFR 404.1520(c) and 416.920(c)).
>
> . . .
>
> 4. [Gustafson] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).
>
> . . .
>
> 5. After careful consideration of the entire record, the undersigned finds that, at all times relevant to this decision, . . . [Gustafson] ha[d] the residual functional capacity to perform a nearly full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). [She] can stand and walk for 6 hours in an 8 hour day; she can sit for 6 hours in an 8 hour day; she can lift and carry, and push and pull 20 pounds occasionally and 10 pounds frequently; she has the following occasional postural limitations: stooping, bending, kneeling, couching and crawling; and she must avoid all exposure to hazards in the workplace (dangerous machinery, working at unprotected heights). Furthermore, after December 31, 2002, [Gustafson] ha[d] the mental residual functional capacity for unskilled, non-complex, routine, repetitive mental tasks, in a low-stress, non-production environment. Prior to December 31, 2002, [Gustafson]'s mental impairments were non-severe.

(Tr. at 17-19.)

In light of the findings regarding residual functional capacity ("RFC") and the testimony of the VE, the ALJ determined that Gustafson would be able to perform her past relevant work ("PRW") as a

dispatcher and as a switchboard operator. (Tr. at 23.) Alternatively, the ALJ found that even if Gustafson were not able to perform any of her PRW, other jobs available in significant numbers existed in the national economy that she could perform. (Id.) Accordingly, the ALJ determined that Gustafson had not been "disabled," as defined in the Act, at any time from June 30, 2001, through the date of her decision, May 5, 2009. (Id.)

## II. ANALYSIS

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (quoting Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005)) (internal brackets omitted) (setting out the standards for judicial review).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)) (internal brackets omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (quoting Laws, 368 F.2d at 642) (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)) (internal brackets omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner or the] ALJ." Hancock, 667 F.3d at 472 (quoting Johnson, 434 F.3d at 653) (internal brackets omitted). "The issue before [the reviewing court], therefore, is not whether [the

claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589.

In undertaking this limited review, the court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[4]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment;

---

[4] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

(3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, the claimant is disabled. Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[5] Step four then requires the ALJ to assess

---

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (emphasis omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

7

whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

In the present case, the ALJ found that Gustafson had not engaged in substantial gainful activity since her alleged onset date. (Tr. at 18.) Gustafson therefore met her burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Gustafson suffered from severe bipolar disorder, anxiety, depression, post-traumatic stress disorder, a history of polysubstance abuse in remission, disorders of the lumbar spine

8

status post surgery, and a history of seizures due to drug abuse.[6] (Id.) The ALJ found at step three that none of Gustafson's impairments met or equaled the severity of any of the disability listings. (Id.) Therefore, the ALJ assessed Gustafson's RFC and determined that she could perform light work with occasional stooping, bending, kneeling, crouching and crawling and no exposure to dangerous machinery or unprotected heights. (Tr. at 19.) Based on Gustafson's mental impairments becoming severe after December 31, 2002, the ALJ added non-exertional limitations of unskilled, non-complex, routine, repetitive mental tasks, in a low-stress, non-production environment. (Id.) As a result of this determination, the ALJ found at step four of the analysis that Gustafson could return to her PRW as a dispatcher and switchboard operator. (Tr. at 23.) Alternatively, the ALJ found at step five that she retained the RFC to perform the jobs of basket filler, silver wrapper and paper inspector, which were available in significant numbers in the national economy. (Id.) Accordingly, the ALJ concluded that Gustafson had not been under a disability at any time from her alleged onset date through the date of the ALJ's decision. (Tr. at 23-24.)

---

[6] The ALJ later clarified at step four that Gustafson's mental impairments (i.e., bipolar disorder, anxiety, depression and post-traumatic stress disorder) were severe only after her date last insured of December 31, 2002. (Tr. at 19.)

Gustafson argues that the ALJ erred at steps two and four of the sequential evaluation. (Doc. 14 at 3-9.) Specifically, she contends that the ALJ erred at step two by failing to find that her mental impairments were severe prior to her date last insured. (Id. at 3-6.) Gustafson further alleges that the ALJ erred at step four by finding that she was capable of performing her past relevant work as a dispatcher and switchboard operator. (Id. at 6-9.) The Commissioner contends otherwise and urges that substantial evidence supports the ALJ's determination that Gustafson was not disabled. (Doc. 16 at 4-7.)

**A. Mental Impairments**

Gustafson first contends that "[t]he ALJ's finding that [Gustafson]'s mental impairments were not severe prior to her date last insured is not supported by substantial evidence." (Doc. 14 at 3.) Gustafson summarizes her mental health treatment from September 1999 (preceding her onset date) to August 2004 (post-dating her date last insured for DIB purposes), and argues that this evidence "establishes that [her] mental impairments had been present for many years prior to her alleged onset day and that they continued essentially unabated at least through her date last insured." (Id. at 6.) Citing 20 C.F.R. § 404.1520(c), Gustafson asserts that her mental impairments met the severity test prior to her date last

insured because they "significantly interfered with her ability to maintain regular sustained employment," and that she was unable to perform jobs as required "as a result of her struggle with her mental problems." (Id.) The court finds these arguments unpersuasive for two primary reasons.

First, the ALJ's conclusion that Gustafson's mental impairments were not severe prior to her date last insured is supported by substantial evidence. An impairment is properly categorized as severe if it "significantly limits" a claimant's ability to perform physical or mental basic work activities. See 20 C.F.R. §§ 404.1520(c), 416.920(c). The ALJ discussed the matter as follows:

> With regards to the claimant's mental impairments, the medical evidence of record reveals that the claimant has a long standing history of mental health treatment for multiple impairments, including bipolar disorder, anxiety, depression, post traumatic stress disorder, and a past history of polysubstance abuse (now in remission). The records show that the claimant was treated in local emergency rooms in 2001 and by a psychiatrist, S. Prasem [sic][7] Reddy, MD, with medication management. Due to an increase in her ongoing symptoms, the claimant sought treatment at the Guilford Center in July of 2002.
>
> . . .
>
> Prior to December 31, 2002, the claimant's mental impairments were non-severe, because the records show only

---

[7] The ALJ mistakenly referred to the psychiatrist who treated Gustafson in 2001 as "S. Prasem Reddy, MD." (Tr. at 20.) In fact, Keshavpal Reddy, MD, treated Gustafson in 2001 (see Tr. at 242-48), and a different psychiatrist, Sundar Reddy S. Pasem, MD, treated Gustafson later in 2005 (see Tr. 379-91.)

> a few emergency room visits for mental health treatment, and only 3 months of psychiatric treatment by Dr. Reddy. During this time period the claimant did not seek or receive regular mental health treatment. Moreover, during the emergency room visits in 2001 and earlier, alcohol and cocaine were found in the claimant's system.
>
> . . .
>
> The state agency psychiatric consultant, Alejandro Vergara, MD, completed a psychiatric review form and a mental residual functional capacity assessment for the claimant dated January 25, 2006. . . . Dr. Vergara . . . determined . . . that there was insufficient psychiatric evidence prior to the claimant's date last insured of December 31, 2002, to establish any severe mental impairment. The undersigned agrees with Dr. Vergara's assessment, because it is supported by the clinical psychiatric evidence of record.

(Tr. at 20-22) (internal citations to the administrative transcript omitted). The ALJ's description of Gustafson's mental health treatment from 1999 to 2002 is correct, (see Tr. at 198-233, 238-48, 294-306), as was his summary of Dr. Vergara's findings (see Tr. at 548-61). Notably, other state agency consultants in addition to Dr. Vergara found insufficient evidence of a mental disorder prior to Gustafson's date last insured due to her failure to attend a mental consultative examination or otherwise cooperate with the agency and respond to inquiries. (See Tr. at 521-39, 566-79, 584-98.) This evidence certainly qualifies as substantial in nature to support the ALJ's conclusion that Gustafson's mental impairments did not

significantly limit her ability to perform basic work activities prior to date last insured.

Second, and equally as significant, even if the ALJ erred by finding Gustafson's mental impairments non-severe prior to her date last insured, any such error is harmless. See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); Morgan v. Barnhart, 142 F. App'x 716, 722-23 (4th Cir. 2005); Bishop v. Barnhart, 78 F. App'x 265, 268 (4th Cir. 2003). Even considering Gustafson's mental impairments as severe after her date last insured and including additional non-exertional limitations in her RFC, the ALJ still found that she retained the ability to perform her PRW, a finding which, as discussed more fully below, is also supported by substantial evidence.

**B. Past Relevant Work**

Gustafson next argues that "[t]he ALJ's finding that [she] can perform her past relevant work as a dispatcher and switchboard operator is not supported by substantial evidence." (Doc. 14 at 6.) She again catalogues her mental health treatment from August 2003 through December 2008 (id. at 6-9), and conclusorily states that "[t]he above cited evidence establishes that [her] mental problems

and the symptoms she experiences preclude her from performing work activity on a regular sustained basis" (id. at 9). Gustafson maintains that "the variability of [her] symptoms" prohibited her from "maintain[ing] a regular work schedule," "be[ing] present on a day to day basis," or "maintain[ing] attention and concentration well enough to complete job tasks in a timely manner." (Id.) The court disagrees.

When assessing Gustafson's RFC, the ALJ concluded that after her date last insured, Gustafson could perform light work involving occasional postural activities, no exposure to job hazards, and "unskilled, non-complex, routine, repetitive mental tasks in a low stress, non-production environment." (Tr. at 19.) The ALJ then relied upon a VE who testified that Gustafson's PRW as a dispatcher corresponded to the position "Dispatcher" in the Dictionary of Occupational Titles ("DOT"), 222.587-038, and that Gustafson's PRW as a switchboard operator corresponded to DOT job title "Switchboard Operator," DOT 235.662-022,[8] both of which are performed at the sedentary level of exertion and are semi-skilled to unskilled in nature, with a Specific Vocational Preparation ("SVP") of 3. (Tr. at 23, 684.) The VE specifically addressed the issue of the

---

[8] The ALJ mistakenly stated that the DOT citation for Switchboard Operator is 235.662-0223 (Tr. at 23), but the hearing transcript and the DOT clarify that it is 235.662-022 (Tr. at 684).

14

potential conflict between Gustafson's unskilled mental RFC and the possibility of these jobs requiring semi-skilled abilities:

> ALJ: And the dispatcher job has an SVP:3. How is it that . . . someone limited to non-complex[,] routine, repetitive tasks could do that job?
>
> VE: It's on the lower . . . end of semi[-]skilled. And generally depending on the organization that she's working for, the individual would actually not have any semi[-]skilled duties. It would be more of unskilled, simple[,] routine, repetitive type of – so there I would beg to differ with the Dictionary of Occupational Titles. The same would hold true for the dispatcher [sic] job.
>
> ALJ: So the actual job you believe is more simple, routine, repetitive –
>
> VE: Yes, Your Honor.
>
> ALJ: – and differs from the DOT?
>
> VE: Yes, Your Honor.
>
> ALJ: Based on your observation and experience?
>
> VE: Observation, experience and placing people in those types of jobs.

(Tr. at 685-86.) Gustafson's attorney then cross-examined the VE regarding the basis of her observation and experience regarding dispatching and switchboard operator jobs. (Tr. at 686-87.) The VE concluded that these jobs existed in significant numbers in the local and national economy (Tr. at 685), and the ALJ, relying upon this testimony, concluded that Gustafson retained the RFC to perform these jobs as they are generally performed in the local and national

15

economy. (Tr. at 23.) In an abundance of caution, the ALJ proceeded to step five and elicited other jobs available in significant numbers in the national economy that Gustafson could perform given her RFC. (Tr. at 23, 687-88.)

In the face of this expert testimony (and alternative step five finding), Gustafson does not point the court to any particular requirements of her PRW that she claims she could not perform during the relevant period, other than a vague reference to an inability to be "present" or "maintain attention and concentration." (Doc. 14 at 9.) However, the state agency consultants evaluating Gustafson's mental impairments both before and after her date last insured all believed that she was capable of maintaining a workweek and attention and concentration adequately for unskilled, simple, routine and repetitive mental tasks. (Tr. at 521-39, 548-98.) No doctor of record has opined otherwise. Under these circumstances, the ALJ's conclusion that Gustafson can perform her PRW is supported by substantial evidence.

## III. CONCLUSION

For the reasons set forth above,

IT IS THEREFORE ORDERED that the Commissioner's decision finding no disability is AFFIRMED, Gustafson's motion for judgment on the pleadings (Doc. 12) is DENIED, the Commissioner's motion for

judgment on the pleadings (Doc. 15) is GRANTED, and this action is DISMISSED WITH PREJUDICE.

               /s/  Thomas D. Schroeder
              United States District Judge

February 25, 2014